Filed 3/5/25  P. v. Avery CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063293 |
| v. | (Super. Ct. No. 19CF1922) |
| DARIOS STEAVEN AVERY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Terry K. Flynn-Peister, Judge. Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A.

Swenson, Christine Y. Friedman, and Monique Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

Darios Steaven Avery appeals from a three-year sentence following his convictions for pandering and attempted pimping of a minor. Avery contends the trial court erred in denying his request for an entrapment instruction. We conclude there was insufficient evidence to support the giving of an entrapment instruction. Avery also argues there was insufficient evidence to support his convictions. As discussed below, we conclude substantial evidence supports the jury's verdict. Accordingly, we affirm.

STATEMENT OF THE CASE

On July 16, 2021, the Orange County District Attorney filed an information against Avery, charging him with (1) human trafficking of a minor, (2) pandering, and (3) attempted pimping of a minor. A jury found Avery guilty of pandering and attempted pimping. The trial court sentenced him to the low term of three years on count 2 (pandering), and imposed and stayed an 18-month low term on count 3 (attempted pimping of a minor). Avery appealed.

STATEMENT OF THE FACTS

I.

PROSECUTION CASE-IN-CHIEF

Orange County Police Sergeant Christina Strunk testified that, in 2019, she was an undercover investigator with the Orange County Human Trafficking Task Force. As part of her investigative work, Strunk created a profile on a social network site under the fictitious name of "Jessica Peters." The profile included nine photographs of her wearing lingerie and dresses

and three photographs of cash. It also stated how much she charged for sex acts.

On May 23, 2019, Avery, using a profile on the same social network site, sent "Jessica" a message, saying, "How are you? Can you come home to Daddy?" Jessica responded, "What do you have to offer?"[1] Avery replied, "'A place, great guidance, and you know you will be straight. If you stay down for the crown, you won't need for nothing. Just know you will be straight 104 percent.'" In response to Avery's request, Jessica gave him her cell phone number, and the two began texting. Avery asked Jessica whether she had a pimp, and she replied by stating she had a pimp and complaining about her pimp's rules. Avery subsequently suggested that Jessica begin working for him.

Strunk testified that Avery's profile, which had photographs of himself and a stack of cash, was similar to profiles of other pimps, and his messages contained pimping vernacular. Sex workers would refer to their pimps as "Daddy," and pay for their "guidance." Pimps will typically refer to themselves as a king, so "'stay down for the crown'" meant to be loyal to the pimp. Finally, his promise of a "place" would be attractive to many sex workers who tended to live "very transitory" lives.

Jessica eventually asked Avery about his "choose-up fee" or a fee a sex worker would pay a pimp to start working under him. Avery replied it was $300. Because Strunk wanted to find out if there were other victims, she asked Avery if he had any other sex worker working for him. After Avery responded that a sex worker had been working for him for five years, she

---

[1] For clarity, we refer to Sergeant Strunk as "Jessica" when she interacts with Avery in that role.

3

ended the conversation by saying she did not think it was going to "work between me and you."

A few hours later, a female sent a text message to Jessica on the social network site, stating her pimp had told her about Jessica and she wanted Jessica to work with them. The female asked Jessica to give Avery "a chance," promising he was not violent. Jessica responded she was interested, but did not "want to do [Avery] dirty" because she was not 18 years old. The female replied Jessica "'should have just told'" Avery her age and reiterated that Jessica should give him a chance.

Subsequently, Avery sent Jessica a text about her being under 18 years old, telling her she should have been open and honest about her age. The two then talked on the phone for 13 minutes. During the phone call, Avery stated he had "a young girl before," that he had a house, and "since you're not 18 years old, we want to stay under the radar."

Avery asked Jessica exactly how old she was, and she answered she was turning 17 years old in two months. Avery then asked if anyone had reported her missing, and she responded, "Nah no one care about me." Avery replied, she might "find your family" with him. When Jessica asked for more details about his rules, Avery explained that the plan was, at night, they would "go out, get money, [and] in the morning come home, have breakfast, and kind of hang out as a family." He reiterated he was not violent. After Jessica confirmed the $300 choose-up fee, she stated she would begin to save that amount. Avery told her to stay safe and to let him know if she wanted to work for him.

The next day, Avery texted Jessica twice. Each time, she responded she had started saving money for the choose-up fee.

On May 26, 29, 30 and 31, Avery texted Jessica to check up on her. She responded only to the May 30th text, stating she had a "shitty weekend" and could not converse with Avery at the moment. On July 2, Avery texted Jessica, asking if she still wanted to work for him. He kept messaging Jessica, until on July 9, Jessica texted, "I'm coming back to OC. What do I need to prove to you I'm for real and wanna choose you?" He responded to let him know and he would pick her up.

On July 10, Jessica called Avery. She asked Avery if he still wanted her to work for him, and he replied in the affirmative. They decided Avery would pick up Jessica when she was with a sex buyer, away from her pimp.

Later that day, Jessica texted Avery that the sex buyer promised he would pay an additional $300, which would bring the total money she could give Avery to $650. Later, Jessica texted Avery the name and address of a motel. After Avery texted Jessica he was "here," police pulled his vehicle over and arrested him.

Strunk advised Avery of his *Miranda*[2] rights, and he voluntarily agreed to speak with her. Avery admitted that he knew Jessica was a minor and a sex worker, and that he was there to collect money from her.

## II.

### DEFENSE CASE

*A. Kenyetta W's Testimony*

Kenyetta W., the mother of two of Avery's children, testified she has known Avery for more than 20 years. She testified he was a good person and a family man. To her knowledge, Avery was not a pimp.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

*B. Shafora H.'s Testimony*

Shafora H. testified that at the time of the incident, she was living with Avery and had been dating him for six years. During the six-year period, she periodically worked as a sex worker. Avery was not her pimp or anyone else's pimp.

Shafora testified she used Avery's phone to create his profile on the social network site. She is bisexual, and was trying to attract girls. She authored and sent all of the messages to Jessica. When Jessica called, Shafora would hand the phone to Avery and give him directions. She testified she was present for all of the calls and never heard anything pimping-related. As to the meetup at the motel, Shafora testified she did not tell Avery they were going to pick up Jessica.

Shafora acknowledged she pled guilty to pandering. As part of her plea, she admitted she committed the crime "with and at the direction of Co-Defendant Avery." Shafora testified this phrase was added by her attorney after she had signed the change of plea form, but acknowledged she subsequently initialed the plea document.

*C. Avery's Testimony*

Avery testified in his own defense. He stated he allowed Shafora to use his phone, and it was Shafora who created the profile on the social network site. Avery denied sending any messages to Jessica. He denied being a pimp, but acknowledged growing up in an area where the sex trade was prevalent. Avery was aware Jessica said she was 17 years old, but he kept conversing with her because "she sounded like she was going through something, and she's a kid and [he] felt sorry for her." He also thought she might be lying about her age because people lie "online all the time."

## III.

### REBUTTAL

Sergeant Strunk was presented with a hypothetical that mirrored the facts in this case. She opined that even if the male did not participate in creating the profile or messaging the minor, the male was guilty of pimping and pandering because at a minimum, he assisted the female associate by speaking with the minor on the phone and driving the female associate to pick up the minor.

### DISCUSSION

## I.

### ENTRAPMENT

During the jury instruction conference, defense counsel requested an entrapment instruction. The court denied the request, finding no "evidence of badgering, persuasion, coaxing, [or] any of that from the undercover operation." Avery contends the trial court erred because substantial evidence supported the instruction.

An entrapment instruction was required "if, but only if, substantial evidence supported the defense." (*People v. Watson* (2000) 22 Cal.4th 220, 222 (*Watson*).) "In California, the test for entrapment focuses on the police conduct and is objective. Entrapment is established if the law enforcement conduct is likely to induce a *normally law-abiding* person to commit the offense. [Citation.] '[S]uch a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other

7

affirmative acts likely to induce a normally law-abiding person to commit the crime.'" (*Id.* at p. 223.) Thus, there are "two guiding principles." (*Ibid.*) "'First, if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established.'" (*Ibid.*) "'Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement.'" (*Ibid.*)

Here, whoever used Avery's profile to contact Jessica initiated the conversation by asking her to "come home to Daddy." When Jessica asked what the person could offer, the person responded, "'A place, great guidance, and you know you will be straight. If you stay down for the crown, you won't need for nothing. Just know you will be straight 104 percent.'" Later, after Jessica texted she was only 17 years old, the person responded Jessica should have been honest about her age. Avery then spoke with Jessica on the phone to persuade her to work for him as a sex worker. On this record, there is no evidence Jessica's actions "would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent." (*Watson, supra,* 22 Cal.4th at p. 223.)

Nor is there any evidence of "affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person." (*Watson, supra,* 22 Cal.4th at p. 223.) Avery notes it was Strunk who raised the issue of the choose-up fee and who called Avery on July 10 asking if he was still interested in being her pimp. These acts, however, occurred after Avery tried to persuade Jessica to work for him as a

sex worker. More important, a $300 or $650 choose-up fee would not be so unusually attractive to a normally law-abiding person that it would cause him to persuade a minor to work as a sex worker for him.

Finally, it is irrelevant whether Shafora did all of the messaging and directed Avery's conduct. Under that version of events, the police conduct was directed at Shafora, not Avery. Thus, Avery would not have grounds for asserting the defense of entrapment. In sum, the trial court properly denied the request for an entrapment instruction.

## II.

### SUFFICIENCY OF THE EVIDENCE

Avery next contends his convictions for pandering and attempted pimping of a minor are not supported by substantial evidence. In considering a challenge to the sufficiency of the evidence, our role is limited. "[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid.*) "It is not our function to reweigh the evidence, reappraise the credibility of witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) And "[w]e need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether "'any rational trier of fact could

9

have found the essential elements of the crime beyond a reasonable doubt.'"'" (*Ibid.*) "Because we must draw all inferences in support of the judgment, [a] defendant 'bears an enormous burden' when challenging the sufficiency of the evidence." (*People v. Vasco* (2005) 131 Cal.App.4th 137, 161.)

*A. Pandering*

Penal Code section 266i, subdivision (a), provides in relevant part: "[A] person who does any of the following is guilty of pandering . . . : [¶] . . . [¶] (2) By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a [sex worker]." (§ 266i, subd. (a)(2).)[3] "[P]andering is a specific intent crime[;] [i]ts commission requires that a defendant intend[s] to persuade or otherwise influence the target 'to become a [sex worker.]'" (*People v. Zambia* (2011) 51 Cal.4th 965, 980 (*Zambia*).)

Avery contends "[t]he totality of [Strunk's] communications with Avery shows she needed no persuasion or inducement to continue to engage in prostitution." Stated differently, Avery argues that because Strunk was posing as a sex worker, he said or did nothing that would have encouraged her to "become a [sex worker]." However, encouraging someone to "become a [sex worker]" under the pandering statute is not limited to causing someone to become a sex worker for the first time. It also "includes encouragement of someone who is already an active [sex worker], or undercover police officer." (*Zambia, supra*, 51 Cal.4th at p. 981.) Here, Avery encouraged Jessica to continue to be a sex worker by offering a "place," "great guidance" and a "family." The evidence was sufficient to support the pandering conviction. (See, e.g., *Zambia* at p. 981 [evidence sufficient to support pandering

---

[3] All further statutory references are to the Penal Code.

conviction where "defendant offered his services as a pimp by telling her he would provide her with protection, housing, and clothing if she turned her earnings over to him"].)

*B. Attempted Pimping of a Minor*

Avery was convicted of attempted pimping of a minor. "Pimping of a minor under section 266h, subdivision (b) includes three elements: (1) the defendant knew the person was a [sex worker]; (2) the defendant derived support in whole or in part from the money or proceeds the person earned as a [sex worker]; and (3) the person was under 18 years old. [Citation.] All that is needed to be convicted of attempted pimping of a minor is 'a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' (§ 21a.) 'The act must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan into action, but the act need not be the last proximate or ultimate step toward commission of the substantive crime.' [Citation.] "'[A]cts which indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design will be sufficient.""" (*People v. Clark* (2019) 43 Cal.App.5th 270, 287, fn. omitted (*Clark*).)

Avery argues he could not be convicted of attempted pimping of a minor because the evidence was insufficient to show (1) he "had the requisite knowledge and intent" or (2) "his conduct went beyond mere preparation." We disagree. Avery's actions went beyond mere preparation because, besides repeatedly encouraging Jessica to work for him as sex worker and informing her about his rules, he drove to the motel to pick up Jessica and the choose-up fee. (See, e.g., *Clark, supra*, 43 Cal.App.5th at p. 287 [defendant's conduct went beyond "mere preparation" where he "repeatedly told Jessica to come to Los Angeles to work for him as a [sex worker]"; "negotiated a choose up fee,

11

[and] gave Jessica specific instructions on how to send the money to him"; "told her she could make $500 per night"; informed her about his plan for her sex work; and "arranged to meet her and told her how to take a bus to Los Angeles where he would pick her up"].) Additionally, substantial evidence supported the jury's finding that Avery had the specific intent to commit the crime of pimping a minor. After being advised of his *Miranda* rights, Avery admitted he knew Jessica was a minor and a sex worker, and that he drove to the motel to collect the choose-up fee. Moreover, a reasonable jury could conclude not only that Avery sent the text messages, but that Avery's written and oral communications indicated he wanted Jessica to work for him as a sex worker and that he was driving to the motel to pick up Jessica so she could start working for him. Substantial evidence supported the conviction for attempted pimping of a minor.

DISPOSITION

The judgment is affirmed.

DELANEY, J.

WE CONCUR:

MOTOIKE, ACTING P. J.

GOODING, J.

12